Kirk A. Pasich (SBN 94242)
KPasich@PasichLLP.com
Pamela M. Woods (SBN 101520)
PWoods@PasichLLP.com
Kayla M. Robinson (SBN 322061)
KRobinson@PasichLLP.com
PASICH LLP
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90049
Telephone: (424) 313-7860
Facsimile: (424) 313-7890

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEDNEY FOODS COMPANY, a Minnesota corporation,<br><br>Plaintiff,<br><br>vs.<br><br>AFFILIATED FM INSURANCE COMPANY, a Rhode Island corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR BREACH OF CONTRACT AND TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Gedney Foods Company ("Gedney") complains of defendant Affiliated FM Insurance Company ("AFM") and alleges as follows:

## NATURE OF THIS LAWSUIT

1. AFM sold Gedney broad "all risk" property insurance policies. Gedney purchased these policies for the express purpose of protecting it against losses from causes such as flood. AFM knew and agreed to this, and collected substantial premiums from Gedney. Unfortunately for Gedney, when Gedney suffered an insured loss, AFM's promises of coverage turned out to be nothing more than empty promises.

**COMPLAINT**

2. Specifically, Gedney was forced to close and relocate a manufacturing operation as a result of flooding at one of its manufacturing operations by the Minnesota River, which runs next to this insured property. When Gedney notified AFM of its loss, AFM wrongfully denied coverage. By this lawsuit, Gedney seeks to recover the amount owed under the insurance policy, plus other damages for AFM's breach of contract and tortious bad faith.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1332(a)(1) and 2201(a). Gedney and AFM are of diverse citizenship and the amount in controversy exceeds $75,000.

4. This Court has personal jurisdiction over AFM pursuant to Federal Rule of Civil Procedure 4(k)(1)(A). AFM has engaged in transactions or business within this state from which this action arises.

5. Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b).

## THE PARTIES

6. Plaintiff Gedney is a Minnesota corporation with its principal place of business in Sun Valley, California. Founded in 1881, Gedney is a leading regional and national manufacturer and marketer of high quality branded and private label pickle, relish, condiment and preserve products. Gedney markets its products under three highly recognized brands—Gedney in the Midwest, Cains in New England, and Del Monte on a national basis—as well as several trademarked sub-brands. Gedney is a subsidiary of PMC Global, Inc.

7. Gedney is informed and believes, and on that basis alleges, that AFM is a Rhode Island corporation with its principal place of business in Rhode Island. Gedney is informed and believes, and on that basis alleges, that AFM is licensed to transact business, and is transacting business, in the State of California and Los Angeles County.

8. Gedney is informed and believes, and on that basis alleges, that AFM is a member of the FM Global group of insurance companies. Gedney is informed and believes, and on that basis alleges, that AFM and the other FM Global insurance companies are extremely sophisticated and knowledgeable in insuring against property losses, and in investigating the risks they are insuring.

9. Gedney is informed and believes, and on that basis alleges, that AFM and the other FM Global companies participate in a wide range of first-party property insurance programs and hold themselves out as being knowledgeable, experienced, and reliable, and willing to insure, and capable of insuring, substantial property damage and business interruption losses. Indeed, AFM publicly proclaims that it "specializes in commercial property insurance for the middle market" and has "depth and breadth" of expertise that is "second to none." *See* https://www.affiliatedfm.com/about/why-afm. AFM also claims that it does "everything [it] can to help clients choose how to best manage, prioritize and reduce future loss in a way that makes practical and affordable sense," adding that its "holistic approach to property risk is backed by over 180 years of engineering expertise and extensive research." *Id.* AFM also represents that it "believe[s] in a swift adherence to the real promise of insurance—getting businesses back to work as quickly as possible," adding that it is "recognized across the industry as second to none in paying claims promptly, fairly and professionally." *Id.*

## THE AFM POLICIES

10. AFM has provided broad, all-risk property insurance coverage to PMC Global, Inc. for many years, including under AFM Policy Nos. SS262 and SS711 ("the Policies"), which were in effect from June 1, 2018, to June 1, 2019, and June 1, 2019, to June 1, 2020, respectively. True and correct copies of at least the relevant portions of the Policies are attached hereto as Exhibits A and B, respectively, and are incorporated by reference.

11. The Named Insured under the Policies is "PMC Global, Inc., and its wholly or majority owned subsidiaries and any interest which may now exist or hereinafter be created or acquired which are owned, controlled or operated by any one or more of those named insureds." Ex. A at 25, Ex. B. at 25. Gedney is therefore an insured under the Policy.

12. Each Policy is an "all risk" property insurance policy—that is, a policy that covers all risks of physical loss or damage except those plainly, clearly, conspicuously, and expressly excluded. Each Policy specifically covers "physical loss or damage caused by or resulting from flood." Ex. A at 60, Ex. B. at 60.

13. Each Policy insures, among other things, Gedney's interests in the real and personal property at 2100 Stoughton Avenue, Chaska, Minnesota, 55318-2200 ("the Property"), the site of Gedney's plant.

14. Each Policy has a limit of liability of $100,000,000 per occurrence subject to certain sub-limits of liability, including a $50,000,000 per occurrence sublimit for all loss or damage resulting from flood. There is a $100,000 per occurrence deductible for loss or damage caused by flood.

15. Like most commercial property insurance policies, each Policy insures not only against physical loss or damage of covered property, but also against the economic losses that can result from such property loss or damage. This coverage is typically referred to as "Business Interruption" coverage.

16. Each Policy insures Business Interruption loss incurred
   as a direct result of physical loss or damage of the type
   insured:
   1. To property as described elsewhere in this Policy
   and not otherwise excluded by this Policy;
   2. Used by the Insured;
   3. While at a location or while in transit as provided by
   this Policy; and

4
**COMPLAINT**

4. During the Period of Liability as described elsewhere in this policy.

Ex. A at 68; Ex. B. at 68.

17. Each Policy also insures coverage for Extra Expense: These are defined as

> The recoverable Extra Expense loss is the reasonable and necessary extra expense incurred by the Insured of the following during the Period of Liability to:
> (a) Temporarily continue as close to normal the conduct of the Insured's business; and
> (b) Temporarily use the property or facilities of the Insured or others:
> All less any value remaining at the end of the Period of Liability for property obtained in connection with the above.

Ex. A at 71; Ex. B. at 71.

18. Each Policy also provides Ingress/Egress coverage. This covers:

> the Business Interruption Coverage loss incurred by the Insured due to the necessary interruption of the Insured's business when ingress or egress from a described location(s) is physical prevented, either partially or totally, as a direct result of physical loss or damage of the type insured to property of the type insured whether or not at a described location.

Ex. A at 76; Ex. B. at 76.

19. Each Policy also provides Leasehold Interest coverage. This covers: the loss incurred by the Insured of Leasehold Interest as follows:

> If the lease agreement requires continuation of rent; and if
> the property is wholly untenantable or unusable, the
> actual rent payable for the unexpired term of the lease; or
> if the property is partially untentable or unusable, the
> proportion of the rent payable for the unexpired term of
> the lease.

Ex. A at 76; Ex. B. at 76.

## THE FLOODING AND THE PROPERTY LOSS AND DAMAGE

20. During the policy period, Gedney leased the Property to use as a facility for manufacturing and packaging its products. The Property is located near the Minnesota River.

21. As part of Gedney's manufacturing and packaging process, wastewater is created, treated and discharged. Therefore, the Property by necessity depends upon its wastewater treatment facility. In general, this facility consists of a system of wastewater treatment ponds, A, B, and C, each with electric powered aeration, earthen walls and dikes, and clay linings. Wastewater enters into a collection basin at the plant, and then flows via gravity feed through dedicated piping into Pond A, overflows through piping into Pond B, and during peak periods through piping into Pond C. The waste water is processed using 8 to 12 electric aerators, depending upon demand, that receive power from an onsite electric distribution hub, which is a small wooden structure containing motor controls and electric meters, feeding pond-side power-boxes and cables connecting to the floating electric aerators. The wastewater quality is tested before being discharged into the Minnesota River, using an electric pump to prime the syphon pipe feeding the v-notch weir gate and discharge piping. This wastewater treatment facility has been permitted and regulated by the Minnesota Pollution Control Agency ("MPCA") for more than 40 years.

22. From April 19, 2018, to May 1, 2019, as a result of heavy rains, the Minnesota River periodically breached its normal banks and flooded nearby property. Floodwaters came onto and inundated the Property, specifically the wastewater treatment facility ponds on the Property and adjacent access roads.

23. As a result of the floodwaters on the Property, the wastewater treatment facility was at times inaccessible to Gedney staff. The manufacturing and packaging process at the Property, however, was able to continue for the short term.

24. Following the flooding, on May 23, 2019, and June 6, 2019, Gedney representatives met with representatives from the MPCA. In these meetings, the MPCA advised Gedney that as a result of the flooding from the Minnesota River, the MPCA no longer wanted any wastewater ponds on flood plains of the Minnesota River. The MPCA further advised Gedney that it would not allow Gedney to use its wastewater treatment facilities at the Property unless and until Gedney submitted both short- and long-term plans for replacing the wastewater ponds.

25. On July 16, 2019, the MPCA confirmed its position that it would not authorize any further use of the wastewater treatment facility without an approved plan in place to decommission and replace the current facility with a new one. In sum, the MPCA required that the wastewater treatment facility be replaced.

26. As a result of the MPCA's statements and directives, Gedney was no longer able to use the Property for its intended purposes. Gedney could no longer continue to manufacture and package its products without a fully functional wastewater treatment facility. Therefore, Gedney stopped procuring new raw materials for the Property and continued to process only existing inventory on hand and green stock commitments. Gedney significantly decreased its production at the Property beginning in June 2019.

27. After investigation, Gedney determined that the cost of either (i) replacing the wastewater ponds at the Property and otherwise modifying the water treatment facilities to accommodate the new ponds, or (ii) building a new water

treatment facility at a suitable location near the Property, would be in excess of $2,000,000.

28. Because Gedney could neither continue its operations at the property with the existing wastewater treatment ponds nor reasonably replace those ponds, Gedney determined that its only course of action was to wind down its production at the Property and move its manufacturing and packing operations to a new facility. Gedney continued operations at the Property (with decreased capacity) through August 30, 2019, and vacated the Property by September 30, 2019.

29. As a result of the floods and the MPCA's actions, Gedney was required to relocate its operations to a new facility in Léon, Mexico. The current and projected cost of dismantling, moving, reassembling, and resuming its operations is in excess of $5,000,000.

30. In addition to the cost of moving its operations, Gedney has suffered business interruption losses as a result of the shutdown and relocation. Although Gedney began initial test production at its new facility on September 4, 2019, it has only recently reached the production output of the equipment prior to the move from the Property to Leon. In addition, Gedney was required to eliminate some of its product lines as a result of the move, resulting in a substantial loss of sales.

31. On September 30, 2019, Gedney gave its landlord notice that, because of the floods and the MPCA's resulting directives, it would no longer continue operations at the Property. However, the landlord demanded that Gedney continue to make payments under the lease. Therefore, Gedney remains liable for both the lease payments for the Property as well as for the new location of its operations.

## AFM'S BREACH OF CONTRACT

32. On July 20, 2020, Gedney notified AFM of the loss.

33. In response to requests by AFM, Gedney provided AFM with substantial information relating to the flooding at the property, Gedney's communications with the MPCA, and Gedney's losses. Specifically, on October 16,

2020, Gedney provided AFM with responses to 23 questions posed by AFM and several hundreds of pages of documents, e-mails, and photographs of the property. Gedney provided additional requested information to AFM on January 28, 2021, and also assisted with AFM's efforts to obtain relevant information from the MPCA.

34. On March 25, 2021, AFM sent a letter to Gedney denying coverage for Gedney's losses. Despite being advised by Gedney that there was flooding on the Property from April 19, 2019, through May 1, 2019, and that Gedney's meetings with MPCA took place after this flooding, AFM stated that no claim for loss was made for the 2019 flooding. AFM also asserted that Gedney was late in notifying it of its loss and further asserted that Gedney's "late notice" of the claim "prejudiced [its] ability to investigate the loss and confirm any actual physical damage to the insured property." However, AFM offered no evidence to establish that it was, in fact, prejudiced, let alone that it was, as the law requires, actually and substantially prejudiced by an alleged "lateness" in notice. Finally, AFM incorrectly asserted that Gedney's decision to relocate its operations was a business decision and "not a direct result of any physical loss or damage of the type insured," ignoring the fact that without the physical loss and damage and the MPCA's orders, Gedney would not have had to relocate its operations.

# FIRST CAUSE OF ACTION
## (Breach of Contract against AFM)

35. Gedney realleges and incorporates by reference paragraphs 1 through 34 above.

36. AFM had a duty under the Policies, the law, and insurance industry custom, practices and standards, to pay Gedney for the loss it incurred, in excess of the Policies' deductible and within the Policies' limits, as a result of the floods.

37. Except as otherwise excused, Gedney has satisfied all conditions and all duties it may have owed under the Policies. Therefore, Gedney is entitled to all benefits and insurance provided by the Policies. AFM breached its duties under the

Policies by, among other things, denying coverage for Gedney's claim and refusing to pay for any part of the loss suffered by Gedney as a result of the floods.

38. As a direct and proximate result of AFM's breach of its duties under the Policies, Gedney has been damaged in the amount in excess of $ 5,900,000, plus interest thereon.

## SECOND CAUSE OF ACTION

### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against AFM)

39. Gedney realleges and incorporates by reference paragraphs 1 through 34 and 36 through 38 above.

40. Implied in the Policies is a covenant that AFM would act in good faith and deal fairly with Gedney, that AFM would do nothing to interfere with Gedney's right to receive the benefits of the Policies, and that AFM would give at least the same level of consideration to Gedney's interest as it gives its own interest.

41. AFM also had a duty under the Policies, the law, and insurance industry custom, practice, and standards, to conduct a prompt and thorough investigation, including an investigation of all bases that might support Gedney's claim for coverage, before asserting coverage defenses or denying coverage.

42. Instead of complying with these duties, AFM breached its implied covenant of good faith and fair dealing by, among other things:

    (a) Artificially and narrowly interpreting the Policies' provisions;

    (b) Asserting grounds for denial of coverage that it knows are not supported by, and in fact are contrary to, the terms of the Policies, the law, insurance industry custom, practice, standards, and the facts;

    (c) Failing to fully inquire into possible bases that might support coverage for Gedney's claim and negate AFM's attempt to avoid its duty to pay Gedney for its covered loss;

    (d) Ignoring California law and insurance industry standards;

   (e) Giving greater consideration to its own interests than it gave to the interests of Gedney; and

   (f) Otherwise acting as alleged above.

43. In breach of the implied covenant of good faith and fair dealing, AFM did the things and committed the acts alleged above for the purpose of consciously withholding from Gedney the rights and benefits to which it was entitled under the Policies, and without considering Gedney's interests at least to the same extent as it did its own interests.

44. AFM acts are inconsistent with Gedney's reasonable expectations, are contrary to established insurance industry custom, practice, and standards, are contrary to legal requirements, are contrary to the express terms of the Policies, and constitute bad faith.

45. Pursuant to the holding in *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), Gedney is entitled to recover all attorneys' fees and costs that it reasonably has incurred, and incurs, in its efforts to obtain the benefits of insurance that have been, and continue to be, wrongfully and in bad faith withheld by AFM.

46. AFM conduct is despicable and has been done with a conscious disregard of Gedney's rights, constituting oppression, fraud, and/or malice, in that AFM engaged in a series of acts designed to deny the benefits due under its insurance policy and to conceal and/or misrepresent material facts.

47. The Insureds are informed and believe, and on that basis allege, that AFM—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of AFM's business—performed, authorized, and/or ratified the bad faith conduct alleged above.

48. As a direct and proximate result of AFM's acts, Gedney has been damaged in an amount in excess of $ 5,900,000, plus the attorneys' fees that it has

incurred, and is incurring, in its effort to obtain the benefits that AFM owes to it under the Policies, plus interest on these amounts.

49. In light of information, facts, and relevant law that it knew or should have known, AFM, by acting as alleged above, consciously disregarded Gedney's rights and forced Gedney to incur substantial financial loss, without any assistance from it, thereby inflicting substantial financial damage on Gedney. AFM consciously ignored Gedney's interests and concerns, with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, Gedney is entitled to recover punitive damages from AFM in an amount sufficient to punish and make an example of it and in order to deter similar conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Gedney prays for relief as follows:

### ON THE FIRST CAUSE OF ACTION

1. For damages according to proof at the time of trial, plus interest;

### ON THE SECOND CAUSE OF ACTION

2. For damages according to proof at the time of trial, including the reasonable attorneys' fees and costs incurred in obtaining the benefits due under the Policy, plus interest;

3. For punitive damages in an amount to be determined at trial;

### ON BOTH CAUSES OF ACTION

4. For costs of suit herein; and

5. For such other, further, and/or different relief as may be deemed just and proper.

DATED: April 30, 2021                    PASICH LLP

By:  */s/ Pamela Woods*
Pamela Woods

Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Gedney hereby demands a trial by jury in this action.

DATED: April 30, 2021

PASICH LLP

By: */s/ Pamela Woods*
Pamela Woods

Attorneys for Plaintiff